2016 IL App (2d) 150047
No. 2-15-0047
Opinion filed March 31, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE CITY OF ELGIN, | ) | On Petition for Administrative Review |
| | ) | from the Illinois Commerce Commission, |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Ill. C. C. Docket No. 13-0657 |
| | ) | |
| THE ILLINOIS COMMERCE COMMISSION, | ) | |
| COMMONWEALTH EDISON COMPANY, | ) | |
| MICHAEL THOMPSON, JENNIFER | ) | |
| THOMPSON, WIND ON THE WIRES, | ) | |
| THE COUNTY OF KANE, ROB MASON, | ) | |
| ROBERT MASON, DIANE MASON, | ) | |
| JERRY DREXLER, KRISTIN DREXLER, | ) | |
| UTILITY RISK MANAGEMENT | ) | |
| CORPORATION, THE VILLAGE OF | ) | |
| SOUTH ELGIN, THE FOREST PRESERVE | ) | |
| DISTRICT OF KANE COUNTY, THE | ) | |
| BOARD OF EDUCATION OF SCHOOL | ) | |
| DISTRICT U-46, INVENERGY WIND | ) | |
| DEVELOPMENT LLC, WAYNE | ) | |
| MUIRHEAD, DEAN MUIRHEAD, DENNIS | ) | |
| MUIRHEAD, JOHN CASH, MARY LEWIS, | ) | |
| LYNN LANDMEIER, BETTY LANDMEIER, | ) | |
| RONALD E. NIGHTINGALE, CAROL J. | ) | |
| NIGHTINGALE, MARK SECCO, ARLENE | ) | |
| WATERMANN, WILLIAM DEUTSCH, | ) | |
| CHRISTINE DEUTSCH, PATRICK | ) | |
| DEUTSCH, THE VILLAGE OF | ) | |
| BURLINGTON, DENISE HUBBARD, | ) | |
| RONALD HAMMES, LINDA HAMMES, | ) | |
| CATERPILLAR INC., EXXONMOBIL | ) | |
| POWER AND GAS SERVICES INC., | ) | |
| THERMAL CHICAGO CORPORATION, | ) | |
| KENYON BROTHERS COMPANY, | ) | |
| OAK RIDGE FARM HOMEOWNERS | ) | |
| ASSOCIATION, THE CITY OF | ) | |
| SYCAMORE, THE COUNTY OF OGLE, | ) | |

DARYL D. BUTTS, THOMAS D. RHOADS, )
SHELLEY J. RHOADS, CONSTANCE E. )
JONES, SADDLEBROOK UNIT II )
PROPERTY OWNERS ASSOCIATION, )
MICHAEL PETERSDORF, and SARAH )
PETERSDORF, )
                                    )
          Respondents. )

---

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal involves a request for direct administrative review of an order of the Illinois Commerce Commission (Commission), which authorized Commonwealth Edison Company (ComEd) to construct a high-voltage transmission line and related facilities across several Illinois counties and designated routes and locations for the new construction. Certain property of the petitioner, the City of Elgin (Elgin), would be affected by the Commission's order. On appeal, Elgin argues that the Commission erred in authorizing the construction of the portion of the transmission line that would run through Elgin, because (1) ComEd did not provide "good cause" for failing to identify an alternate route for the line through Elgin; (2) ComEd failed to show that the proposed route was the "least-cost" means to achieve its objectives; and (3) the staff of the Commission (Staff) failed to adequately consider the issues of "good cause" and "least-cost." We affirm.

¶ 2                          I. BACKGROUND

¶ 3     The Public Utilities Act (Act) (220 ILCS 5/8-406 (West 2012)) requires that a public utility obtain a certificate of public convenience and necessity from the Commission before beginning new construction within Illinois. Section 8-406 of the Act sets forth the requirements for obtaining such a certificate. *Id.* Effective July 28, 2010, the legislature enacted section 8-

406.1 of the Act (220 ILCS 5/8-406.1 (West 2012)), providing an expedited procedure for a public utility to apply for a certificate when seeking to construct a new high-voltage electric-service line and related facilities. Under the expedited procedure, the Commission is required to issue a decision granting or denying a request for a certificate "no later than 150 days after the application is filed." 220 ILCS 5/8-406.1(g) (West 2012). The expedited procedure also requires the applicant to provide a primary right-of-way and one or more alternate rights-of-way for the project, as part of the filing. 220 ILCS 5/8-406.1(a)(1)(B)(viii) (West 2012). However, upon a showing of "good cause" in its filing, an applicant may be excused from providing alternate rights-of-way. *Id.*

¶ 4    Further, a certificate must be issued where the Commission finds that the proposed project will promote the public convenience and necessity and the following criteria are satisfied:

"(1) That the Project is necessary to provide adequate, reliable, and efficient service to the public utility's customers and is the least-cost means of satisfying the service needs of the public utility's customers or that the Project will promote the development of an effectively competitive electricity market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying those objectives.

(2) That the public utility is capable of efficiently managing and supervising the construction process and has taken sufficient action to ensure adequate and efficient construction and supervision of the construction.

(3) That the public utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8-406.1(f) (West 2012).

¶ 5    On December 2, 2013, ComEd filed a verified petition for a certificate of public convenience and necessity under the expedited procedure set forth in section 8-406.1 of the Act

(220 ILCS 5/8-406.1 (West 2012)). The petition sought authorization to install, operate, and maintain an overhead 345-kilovolt electric-transmission line starting from ComEd's existing substation in the city of Byron, running east through Ogle, De Kalb, Kane, and Du Page Counties, and ending at ComEd's substation in the Village of Wayne. ComEd named the proposed line the Grand Prairie Gateway Transmission Line Project (the Project). The petition provided a primary route for the transmission line that was about 60 miles in length. Additionally, the petition provided an alternate route, about 68 miles in length, for about 80% of the Project. ComEd did not provide an alternate route for the other 20%, namely, the 12 miles of transmission line that would run through Elgin.

¶ 6 Petitions to intervene were filed by numerous individuals and entities that owned property that would be affected by ComEd's petition. Elgin is the only intervenor taking part in this appeal. On December 4, 2013, Elgin adopted a resolution declaring opposition to the proposed routing and design of the Project. In the resolution, Elgin stated that the proposed route through Elgin was adjacent to several existing residential developments and an existing elementary school. Elgin further stated that the proposed routing would have adverse environmental impacts, adverse social and land-use impacts, adverse impacts on numerous landowners, adverse impacts on homes and other structures, adverse impacts on existing and planned developments, and an adverse visual impact on the community. The resolution indicated that the Project should not be approved but that, if it were, ComEd should be required to install the Elgin portion of the transmission line underground.

¶ 7 Numerous transcripts of direct, rebuttal, and surrebuttal testimony, submitted by the parties, were filed as exhibits in this matter. The Commission held evidentiary hearings on the issue on April 15, 16, and 17, 2014. Among the parties participating in the hearings were ComEd and the Staff. Elgin did not participate in the evidentiary hearings, but the prefiled direct

testimony of its mayor was admitted into evidence. At the hearings, the participating parties presented testimony by witnesses and/or affidavits. While we do not summarize all the evidence that was set forth before the Commission, we note some of the testimony that is relevant to the issues raised on appeal.

¶ 8    Some intervenors testified that their ability to use their property would be disrupted by the Project's primary route. There were also concerns about the visual impacts and the health effects from the electromagnetic fields. Elgin asserted that the proposed route would have a direct negative impact on its residents and landowners due to its close proximity to residential developments and an elementary school. There were concerns about property values and health. Elgin also asserted that the Project would adversely impact future land use and development in the area and have a deleterious effect on the appearance and aesthetics of the city. While some intervenors proposed alternate routes across their property, Elgin did not propose any alternate routes.

¶ 9    Paul McGlynn testified on behalf of ComEd. McGlynn testified that he was the director of the system planning division of PJM, the regional transmission organization that operates the transmission system in ComEd's service territory. PJM is regulated by the Federal Energy Regulatory Commission and is responsible for the planning, operation, and reliability of the interstate electric-transmission system under its functional control, which spans 13 states and the District of Columbia. PJM identified a congestion problem in Illinois that was resulting in higher energy costs for Illinois consumers, and it was thus required to develop and implement upgrades to the transmission system. PJM evaluated several alternatives to determine which project would effectively resolve the congestion issues. In addition to evaluating the Byron-to-Wayne circuit, PJM evaluated a possible line from Byron to Cherry Valley to Pleasant Valley, or some variation thereof. The different proposals were compared on a number of factors,

including reliability, cost, operational performance, right-of-way requirements, and route diversity. PJM concluded that the Project, using the Byron-to-Wayne circuit, was the optimal solution to the congestion issues.

¶ 10 Donnell Murphy also testified on behalf of ComEd. Murphy testified that she was a partner with Environmental Resources Management (ERM), a leading global provider of environmental, health, safety, risk, and social consulting services. ComEd retained ERM to assist in identifying primary and alternate routes from Byron to Wayne for the Project. Murphy testified as to the extensive routing study and public process ComEd conducted to identify the primary route for the Project.

¶ 11 Yassir Rashid provided direct testimony on behalf of the Staff. He was an electrical engineer employed by the Commission in the "Energy Engineering Program of the Safety & Reliability Division." The program's function was to monitor the practices of Illinois's regulated utilities and to provide information, technical expertise, and recommendations on matters before the Commission, through Staff reports or testimony. He reviewed ComEd's petition and participated in two open-house events where ComEd representatives explained the purpose of the Project and the route-selection process and responded to questions from the public. Rashid also completed a field inspection of the proposed primary and alternate routes. He concluded that the primary and alternate routes were satisfactory and that there were no features that should preclude their use. He also testified that ComEd's petition included all the information required by section 8-406.1(a)(1) of the Act (220 ILCS 5/8-406.1(a)(1) (West 2012)).

¶ 12 Neil Kaup testified that he was employed by ComEd as a senior overhead transmission engineer. He was responsible for the design and maintenance of and standards and specifications for various overhead transmission lines. He participated in the basic design and route-selection process for the Project. He testified that there was good cause for failing to provide an alternate

route through Elgin. Alternate routes were not viable, because they would require excessive additional line length and would cause considerably more impact because they would have to go through more congested areas. Additionally, ComEd did not have property rights in these congested areas. Based on the route-selection process conducted by ERM, ComEd concluded that the primary route represented the best combination of engineering feasibility, least-cost, and lowest impact on the surrounding areas.

¶ 13    In rebuttal to several intervenors that recommended installation of underground transmission lines for sections of the Project, Kaup testified that installing an underground transmission line was cost-prohibitive and was done only when there was no corridor available for an overhead transmission line. An overhead transmission line was always the least-cost choice. Underground transmission lines were generally located in densely populated and heavily developed city centers. The cost to install one mile of underground transmission line was $31 million. In addition, two terminal substations, which would cost $12 million, would be required for the transitions between overhead and underground. Faults on underground transmission lines are more time-consuming and expensive to locate and repair, resulting in longer power-restoration times following interruptions.

¶ 14    On April 30, 2014, the Staff filed an initial brief. The Staff concluded that ComEd's petition should be granted because of the Project's cost-benefit for ComEd customers. Richard Zuraski, an economist employed by the Commission, conducted a cost-benefit analysis of the Project and determined that it would be beneficial to Illinois consumers by a wide margin. Based on Zuraski's analysis, the Staff estimated the net benefits of the Project to be in the range of $121.1 to $324.6 million. The Staff noted that there were also other benefits, such as reduced emissions of environmental pollutants, increased reliability, and enhanced operational performance. The Staff concluded that, because the Project would reduce net costs and

consumers' prices, the Project would promote the development of an effectively competitive electricity market that would operate efficiently, be equitable to all customers, and be the least-cost means of satisfying those objectives.

¶ 15    On September 4, 2014, the administrative law judges (ALJs) hearing the proceedings on behalf of the Commission issued a proposed order.  In that order, the ALJs found that ComEd had not shown that the proposed route was equitable to all customers or that it was the least-cost means of achieving the statutory objectives.  The proposed order further concluded that ComEd had not provided good cause for failing to identify an alternate route for the portion of the Project that would run through Elgin.  The order thus concluded that ComEd had not met the Act's requirements and that its petition should be denied.  Thereafter, the parties had the opportunity to file briefs on exceptions to the proposed order, pursuant to a schedule set by the ALJs.

¶ 16    On September 18, 2014, the Staff filed a brief on exceptions, asserting that the Commission should reject the ALJs' conclusion because (1) ComEd satisfied the statutory requirement to identify an alternate right-of-way or showed good cause to be excused from the requirement; (2) the record supported a finding that the Project was equitable to all customers and the least-cost means of satisfying the statutory objectives; and (3) running a portion of the Project underground was not an appropriate means to satisfy the alternate right-of-way requirement.

¶ 17    On October 22, 2014, the Commission issued its final order.  The final order did not adopt the ALJs' findings and conclusion as set forth in the proposed order.  Rather, the Commission concluded that ComEd had met the statutory requirements and thus it issued the requested certificate of public convenience and necessity.  The Commission concluded that ComEd had shown good cause for failing to identify an alternate route through Elgin.

Additionally, the Commission noted that ComEd had presented a number of benefits of the Project, including lower energy charges, increased transmission capacity, reduced congestion, substantial transfer capability, and reduced carbon output by nearly half a million tons over 15 years. Based on these benefits, the Commission concluded that the Project would "promote the development of an effectively competitive electricity market that operates efficiently, [was] equitable to all customers, and [was] the least cost means of satisfying those objectives." 220 ILCS 5/8-406.1(f)(1) (West 2012).

¶ 18    In determining whether the Project was the least-cost means of satisfying the statutory objectives, the Commission noted that PJM deemed the Project the best solution over eight alternatives. The Commission noted that McGlynn testified that the Project was reviewed and selected from a pool of nine different proposals. The proposals were compared on a number of factors, including reliability, cost, operational performance, right-of-way requirements, and route diversity. Given this comparison of numerous routes, the benefits noted above, and "the fact that ComEd own[ed] rights of way for approximately 70% of the proposed line," the Commission found that the Project was the least-cost means of satisfying the statutory objectives.

¶ 19    As to the routing of the Project, the Commission found that ComEd had made a showing of good cause (see 220 ILCS 5/8-406.1(a)(1)(B)(viii) (West 2012)) to excuse it from providing an alternate right-of-way for the portion that would run through Elgin. The Commission noted that evidence showed that the eastern portion of the right-of-way was densely populated such that ComEd could not provide a viable alternative route with the right-of-way width necessary to accommodate the Project. In support, the Commission cited Murphy's testimony that, due to the dense population in the area, alternate routes where no existing residents would have to be displaced were unavailable. Murphy also testified that the limited number of alternate routes available would have required excessive line length and resulting excessive cost. Additionally,

the primary route paralleled an existing transmission line across the Fox River, resulting in reduced impact specific to the river. Also in support, the Commission cited the initial brief of its Staff, dated April 30, 2014. In that brief, the Staff stated that it had conducted a field inspection of the primary route and determined that it was satisfactory and that no features should preclude its use. Rashid also testified that ComEd established good cause for failing to provide an alternate route through Elgin.

¶ 20    The Commission noted the 12 factors it normally considered when evaluating the propriety of various routing proposals and stated that "the question of least-cost in this context involves a comprehensive evaluation and balancing of the overall costs and externalities of each proposed route against the benefits of any other proposed route." The Commission noted that the Project would use property that is an existing railroad right-of-way and that ComEd had the right to use much of this property. The Commission found that the primary route was selected because it would minimize the number of homes on the route. The Commission also found that ComEd's acquisition of the rights-of-way preceded property developments in Elgin and were noted on the plats at the time of the property's development and sale.

¶ 21    Further, the Commission noted that, in the public-input phase of the proceedings, Elgin requested that ComEd investigate the possibility of locating the Elgin portion of the Project underground. The Commission held that locating the transmission line underground would not satisfy the Act's requirement that an alternate route be identified (see 220 ILCS 5/8-406.1(a)(1)(B)(viii) (West 2012)), because an alternate route cannot use the same strip of land as the primary route. Regardless, the Commission found that ComEd had shown that placing the transmission line underground was too expensive to be a viable option. Specifically, there was testimony that running 12 miles of transmission line underground through Elgin would cost an additional $396 million. The Commission found that this would more than double the cost of the

Project.  The Commission noted that, while a more thorough engineering analysis of running the Elgin portion of the Project underground would have been preferred, ComEd's preliminary estimates were credible and compelling enough to establish that running the line underground would not be the least-cost option.  The Commission concluded that ComEd provided good cause for not identifying an alternate route for the Elgin portion of the Project.[1]  The Commission found that the requirements of section 8-406.1 of the Act had been met and thus it granted ComEd's petition for a certificate of public convenience and necessity.

¶ 22    On November 21, 2014, Elgin filed an application for rehearing.  On December 10, 2014, the Commission denied the application for rehearing.  Thereafter, Elgin filed a timely notice of appeal.

¶ 23                                   II. ANALYSIS

¶ 24    Elgin appeals to this court for direct review pursuant to Illinois Supreme Court Rule 335 (eff. Feb. 1, 1994) and section 10-201 of the Act (220 ILCS 5/10-201 (West 2012)).  On appeal, Elgin argues that the Commission erred in authorizing the construction of the portion of the transmission line that would run through Elgin, because (1) ComEd did not provide "good cause" for failing to identify an alternate route for the line through Elgin; (2) ComEd failed to show that the proposed route was the least-cost means to achieve the statutory objectives; and (3) the Staff failed to adequately consider the issues of "good cause" and "least-cost."

---

[1] We note that Elgin failed to provide its own cost estimate for any portion of the project, let alone any route through Elgin, in either its initial or its reply brief.  The appellant has the burden of establishing error, and failing to include such information makes any meaningful review, with respect to actual costs, virtually impossible.

¶ 25    In reviewing an order of the Commission, courts are limited to the following questions: " '(1) whether the Commission acted within the scope of its authority, (2) whether the Commission made adequate findings in support of its decision, (3) whether the Commission's decision was supported by substantial evidence in the record, and (4) whether constitutional rights have been violated.' " *Adams County Property Owners & Tenant Farmers v. Illinois Commerce Comm'n*, 2015 IL App (4th) 130907, ¶ 30 (quoting *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 476 (1994)).   Substantial evidence exists if a reasoning mind would accept the evidence as sufficient to support the challenged finding; it consists of more than a mere scintilla of evidence but may be less than a preponderance of the evidence. *Id.*

¶ 26    The Commission is entitled to great deference and a reviewing court should not reevaluate the credibility and weight of the evidence or substitute its judgment for that of the Commission. *Id.* ¶ 29.  The Commission's factual findings will not be overturned unless they are against the manifest weight of the evidence, *i.e.*, a conclusion opposite to that reached by the Commission is clearly evident. *Id.* ¶ 31.  When the Commission's decision involves a mixed question of law and fact, it is reviewed under the clearly-erroneous standard and will not be overturned unless the reviewing court has a definite and firm conviction that the Commission erred.   *Id.* ¶ 32.  The Commission's determination regarding a question of law is reviewed *de novo*. *Id.* ¶ 33.  However, the Commission's interpretation of a statute that it is charged with administering is entitled to substantial deference. *Id.*   In addition, a court may overturn the Commission's interpretation of its own rules only if its construction is erroneous, arbitrary, or unreasonable. *Id.*

¶ 27                                        A. Good Cause

¶ 28   Elgin's first contention on appeal is that the Commission erred in finding that ComEd met its burden of showing good cause for failing to identify an alternate route for the Project through Elgin.   Section 8-406.1(a)(1)(B)(viii) of the Act required ComEd to "provide and identify a primary right-of-way and one or more alternate rights-of-way for the Project as part of the filing."   220 ILCS 5/8-406.1(a)(1)(B)(viii) (West 2012).   However, "[u]pon a showing of good cause in its filing, an applicant may be excused from providing and identifying alternate rights-of-way."   *Id.*   Elgin argues that ComEd failed to provide sufficient evidence to establish the requisite good cause.

¶ 29   The Commission is responsible for evaluating the evidence before it.   *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 327 Ill. App. 3d 768, 776 (2002).   As the trier of fact, the Commission must judge the credibility of the witnesses and determine the weight to be given their testimony, and its findings will not be overturned unless they are against the manifest weight of the evidence.   *Id.* at 777.   Further, the Commission's determination as to whether ComEd satisfied the requirements of section 8-406.1(a)(1)(B)(viii) must be given substantial weight and deference.   *Adams County*, 2015 IL App (4th) 130907, ¶ 33.

¶ 30   The Commission's determination that ComEd had established good cause for failing to provide an alternate route through Elgin is not against the manifest weight of the evidence. Attached to ComEd's initial application was Murphy's direct testimony in which she testified as to her extensive experience in the routing, permitting, and construction of thousands of miles of high-voltage electric-transmission lines.   She further testified as to the comprehensive route-selection study that had been conducted and the extensive public outreach by ComEd to keep the public informed during the route-selection process.   Murphy also testified that the width of any right-of-way had to accommodate both the Project and any future circuits.   Any alternate route

running through Elgin would have resulted in displacement of existing residents or excessive line length.

¶ 31   In her rebuttal testimony, Murphy reiterated that ComEd solicited extensive public involvement during its routing analysis and that alternate routes that did not require residential displacement were extremely limited.  ComEd had identified only one potential alternate route but it was not considered viable due to its excessive length and resulting excessive cost.  Murphy further stated that Staff witness Rashid also believed that ComEd demonstrated good cause for failing to provide an alternate route through Elgin.

¶ 32   Elgin argues that Murphy's testimony was conclusory and failed to set forth the alternate routes that would have resulted in displacement or excessive line length.  However, at the evidentiary hearings, Elgin did not cross-examine Murphy as to her findings and did not provide any evidence that there were in fact viable alternate routes through Elgin.  We acknowledge that Elgin requested that the proposed transmission line through Elgin be installed underground.  However, ComEd provided evidence that this was cost-prohibitive.  Accordingly, we cannot say that the Commission's finding of good cause is against the manifest weight of the evidence.

¶ 33   Elgin also argues that, in making a good-cause determination under section 8-406.1(a)(1)(B)(viii), the Commission can consider only the application and exhibits attached thereto; it cannot consider exhibits or other evidence filed subsequently.  Elgin relies on the language in that section, which states that an applicant may be excused from proving alternate rights-of-way upon a showing of good cause "in its filing."  220 ILCS 5/8-406.1(a)(1)(B)(viii) (West 2012).  We disagree and hold that it was not improper for the Commission to consider evidence contained in the subsequent filings or presented at the hearings in support of the initial showing of good cause, as provided by Murphy's direct testimony that was attached to ComEd's application.

¶ 34 When interpreting a statute, it must be viewed as a whole. *Holland v. City of Chicago*, 289 Ill. App. 3d 682, 687 (1997). Thus, a particular provision must not be read in isolation, but must be read in conjunction with all other relevant provisions. *Id.* Section 8-406.1(f) of the Act (220 ILCS 5/8-406.1(f) (West 2012)) provides, in part, that the Commission shall grant a certificate of public convenience and necessity "if, based upon the application filed with the Commission *and the evidentiary record*, it finds the Project will promote the public convenience and necessity." (Emphasis added.) Accordingly, when sections 8-406.1(a)(1)(B)(viii) and 8-406.1(f) are read in conjunction, the statute clearly allows the Commission to consider the entire evidentiary record when determining whether to grant a certificate of public convenience and necessity, and that determination necessarily includes a finding as to whether, if the applicant failed to provide an alternate right-of-way, the applicant demonstrated "good cause in its filing." As such, the Commission properly considered the entire evidentiary record in finding that ComEd demonstrated good cause.

¶ 35 Elgin further argues that Murphy's testimony demonstrates that ComEd's main consideration in determining the primary route was its existing property rights and that ComEd thus failed to consider other relevant factors. Elgin's argument is without merit. In her direct testimony, Murphy stated that "we looked at current land uses holistically and did not simply assume that a particular route segment should be accepted simply because ComEd had existing rights." In her rebuttal testimony, Murphy testified that the primary route through Elgin followed the shortest and most direct path and that "[d]eviating away from this route would not only reduce ComEd's ability to make use of existing rights it had previously acquired, which would increase the cost of the Project, but would also very likely result in a greater impact to more existing residences as a function of length and density of development north and south of the railroad corridor." In her surrebuttal, Murphy testified that, in identifying a primary route,

ComEd considered not only its existing property rights, but the potential impacts on all environmental features and land uses. Thus, Murphy's testimony demonstrates that, while existing property rights were a consideration in determining the primary route for the Project, ComEd also considered other factors, including line length, residences affected, and other environmental factors and land uses.

¶ 36    Elgin next argues that ComEd's routing study and the statutorily mandated public process did not demonstrate good cause. Elgin acknowledges that ComEd conducted a comprehensive routing study, spending approximately 20,000 hours evaluating maps and photographs and collecting extensive data. Elgin argues, however, that ComEd produced only its conclusions and did not provide any of the data for independent analysis. There is no indication in the record that Elgin ever requested the underlying data or moved to conduct its own analysis. Elgin could have sought, through the discovery process, the possibilities that ComEd examined and rejected. Elgin also could have cross-examined Murphy regarding the other routes through Elgin that were considered. Elgin never did so and never offered any of its own evidence that there was a viable alternate route. The Commission's determination regarding the credibility of the witnesses and the weight of the evidence is given much deference. *Illinois Bell*, 327 Ill. App. 3d at 777. As such, in the absence of any contradictory evidence, we cannot say that the Commission's determination is against the manifest weight of the evidence.

¶ 37                     B. Alternate Right-of-Way

¶ 38    Elgin's second contention on appeal is that ComEd should have been required to propose underground construction as an alternate right-of-way. Elgin also argues that the preliminary testimony about the excessive cost of running transmission lines underground was not sufficient to establish the least-cost criterion, because it failed to consider all the criteria that are to be

considered in a routing analysis, including community acceptance, visual impact, social impact, and land-use impact.

¶ 39    The Commission held that simply rerouting a proposed transmission line from overhead to underground would not satisfy the statutory requirement to propose an alternate right-of-way (see 220 ILCS 5/8-406.1 (West 2012)), because whether "the line is no longer visible does not change the fact that the same right-of-way is impacted."  In so ruling, the Commission noted that it agreed with the Staff's conclusion on this issue.  In its brief on exceptions, the Staff stated that, in order for an applicant to provide an alternate right-of-way as required by statute, the applicant must identify an alternate route that does not use the same strip of land as the primary route.  The Commission agreed with the Staff's argument that, if proposing an alternate right-of-way were as simple as using the same route, only underground, the statute's requirement of proposing an alternate route would be eviscerated, because running the line underground would always be more expensive.

¶ 40    The Commission further determined that, even if ComEd were required by statute to propose running the transmission line underground as an alternate right-of-way, it met its burden to be excused from the requirement by presenting evidence that this alternative was too expensive to be considered a viable option.  The Commission cited Kaup's testimony and found that running the transmission line underground through Elgin would cost an additional $396 million.  The Commission noted that this would more than double the cost of the Project.  The Commission found that the benefits of the Project were unlikely to justify the additional cost of running the line underground.  Additionally, the Commission noted that requiring all ComEd customers to bear the cost of running the Elgin portion of the line underground was contrary to past Commission practice.

¶ 41    We need not address whether simply rerouting a proposed transmission line from overhead to underground would satisfy the statutory requirement to propose an alternate right-of-way. We agree with the Commission that, even if ComEd were required by statute to propose the right-of-way underground, ComEd met its burden to show that such a proposal was too expensive to be chosen as either the primary route or a reasonable viable alternative. Based on the evidence, we cannot say that the Commission's determination is against the manifest weight of the evidence.

¶ 42    ComEd witness Kaup testified that a preliminary analysis indicated that installing the transmission line underground through Elgin would cost about $31 million per mile plus $12 million for two terminal substations, which are necessary for the transition from overhead to underground. As the transmission line through Elgin would be 12 miles, the cost to run it underground would be about $396 million. As noted by the Staff in its brief on exceptions, "[n]ot only would an additional [$396] million for the Elgin segment alone more than double the $251 million estimated cost of the primary route ***, it would completely wipe out the present value of the project's net benefits." As such, the evidence indicates that running the transmission line underground would eliminate the cost-saving benefit of the Project.

¶ 43    Elgin attempts to undermine Kaup's testimony by arguing that it was based on a preliminary analysis and noting that he testified that he could not give a confidence level as to the accuracy of his preliminary estimate. However, Kaup also testified that his preliminary estimate was based on similar projects that had been done in the past. Additionally, he testified that installation of an underground transmission line was generally cost-prohibitive, unless there was no corridor available to install an overhead transmission line. Further, the Staff acknowledged Kaup's testimony that the actual cost of underground transmission lines could vary by more than 25%. However, the Staff found that, even assuming a variance of 30%

(increasing costs by $269 million rather than $396 million), running the line underground would still more than double the cost of the Project. The Commission is responsible for weighing the evidence and Elgin has failed to meet its burden to show that a conclusion opposite to that reached by the Commission is clearly evident.

¶ 44    Elgin also argues that, even if running the line underground was substantially more expensive, this did not establish that it was not the least-cost option, because there were other factors to consider besides cost, such as adverse impacts on existing homes, lack of community acceptance, visual impact, and social and land-use impacts. The Commission found that these factors were considered when PJM determined that the Byron-to-Wayne circuit was the best way to resolve the overall congestion issues. Further, evidence indicates that these factors were considered in determining the primary route for the Project. Murphy testified that the primary route was the least disruptive to existing residences and was the most direct path. Finally, to require all ratepayers to bear the cost of installing an underground line through Elgin would be against Commission practice. See *City of Chicago v. Illinois Commerce Comm'n*, 264 Ill. App. 3d 403, 410-11 (1993). Although not all the factors weighed in favor of the Project, the record was adequate to establish that the benefits of the Project did not justify the additional cost of installing the Elgin portion of the line underground. As such, again, we cannot say that a conclusion opposite to that reached by the Commission is clearly evident.

¶ 45                                  C. Least-Cost Means

¶ 46    Elgin's third contention on appeal is that the Commission erred in finding that ComEd met its burden of showing that its proposed route was the least-cost means of achieving the statutory objectives and was equitable to all customers. Section 8-406.1(f) provides:

> "(f) The Commission shall, after notice and hearing, grant a certificate of public convenience and necessity filed in accordance with the requirements of this Section if,

based upon the application filed with the Commission and the evidentiary record, it finds the Project will promote the public convenience and necessity and that all of the following criteria are satisfied:

> (1) That the Project is necessary to provide adequate, reliable, and efficient service to the public utility's customers and is the least-cost means of satisfying the service needs of the public utility's customers or that the Project will promote the development of an effectively competitive electricity market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying those objectives." 220 ILCS 5/8-406.1 (West 2012).

In this case, ComEd asserted the second proposition in section 8-406.1(f)(1), that the Project would promote the development of an effectively competitive electricity market that would operate efficiently, be equitable to all customers, and be the least-cost means of satisfying those objectives.

¶ 47    The Commission has broad discretion to decide whether a petition should be approved under the public-convenience standard. *Illinois Power Co. v. Illinois Commerce Comm'n*, 111 Ill. 2d 505, 511 (1986). The Act does not define "least-cost" or articulate the manner in which the "least-cost means" should be determined by the Commission. *Adams County*, 2015 IL App (4th) 130907, ¶ 54. Generally, the Commission uses 12 criteria in evaluating a proposed route, including the (1) length of the line, (2) difficulty and cost of construction, (3) difficulty and cost of operation and maintenance, (4) environmental impacts, (5) impacts on historical resources, (6) social and land-use impacts, (7) number of affected landowners and other stakeholders, (8) proximity to homes and other structures, (9) proximity to existing and planned development, (10) community acceptance, (11) visual impact, and (12) presence of existing corridors. *Id.* ¶ 55. No factor is inherently more important than another factor. *Id.*

¶ 48    The Commission found that ComEd had presented a number of benefits to be derived from the Project, including structural benefits, increased transmission capacity, decreased congestion, more low-cost generation, and reduced carbon output.  The Commission noted that witnesses testified that the new transmission capabilities would reduce congestion and result in lower prices for electric service.  The Staff estimated that the net benefits resulting from the Project would be in the range of $121.1 million to $324.6 million.  The Commission stated that, in determining whether the Project was the least-cost means of satisfying the statutory objectives, it would consider "not only an assessment of the particular siting features of the route, for which the Commission has historically used twelve criteria, but it also includes a determination that the project is the least-cost means of achieving the purported objectives."

¶ 49    The Commission concluded that the Project was the least-cost means of achieving its objectives.  The Commission cited McGlynn's testimony that the Byron-to-Wayne circuit was reviewed and selected from a pool of nine different proposals to resolve broader congestion issues.  After the initial review, the Byron-to-Wayne circuit was chosen as the optimal solution, following which several of the other proposals were modified and resubmitted for evaluation. Thereafter, it was concluded that this circuit remained the best solution.  Next, ComEd conducted an extensive routing study and public process to determine the best route for the Project.  The Commission found that, given the analysis and numerous routes considered by PJM, the cost-benefit analysis conducted by the Staff, and the fact that ComEd owned rights-of-way for about 70% of the proposed transmission line, the Project was the least-cost means of satisfying the statutory objectives.  The Commission stated that consideration had been given to the 12 criteria in determining the appropriateness of the Project as designed.

¶ 50    Elgin first asserts that ComEd failed to prove that the primary route was least-cost because it failed to provide an alternate route for comparison sake.  However, by including the

good-cause exception (220 ILCS 5/8-406.1(a)(1)(B)(viii) (West 2012)) to identifying an alternate route, the statute clearly does not require a comparison. As such, the Commission was not required to consider costs of alternative routes in making a least-cost determination.

¶ 51    Elgin further argues that ComEd never addressed the 12 criteria that the Commission generally uses to evaluate proposed routes. However, there was evidence that the Byron-to-Wayne circuit was chosen from among nine alternatives to resolve overall congestion issues. The Commission found that the 12 criteria had been considered in determining the appropriateness of the Project as designed. In its order, the Commission gave an example of one alternate route that was compared with the Project on the issues of reliability, cost, operational performance, right-of-way requirements, and route diversity. The alternate route would create reliability issues and be more costly to construct. Additionally, Murphy's testimony also showed that various factors were considered in evaluating the best route for the Project. For example, Murphy testified that the chosen path was the shortest and most direct path through Elgin and that any other route would have affected more residents and resulted in excessive line length. Murphy also pointed out that plat maps clearly depicted ComEd's easement rights in the affected subdivisions before the property was developed and sold and that, therefore, the residents could not now claim surprise that ComEd intended to make use of those rights. Elgin's argument that the 12 criteria were not considered is without merit.

¶ 52    Elgin also argues that the Commission failed to consider the negative impacts that the Project would have on Elgin. Elgin notes that there was testimony that the Project would have a direct negative impact on Elgin residents along the route and on a nearby elementary school. It also notes that there was testimony that the transmission lines would adversely impact future land use and development and the visual aesthetics of the city. However, merely pointing out that there was evidence in the record to support an alternate conclusion is not a sufficient basis to

overturn the Commission's decision. *Adams County*, 2015 IL App (4th) 130907, ¶ 67. "The Commission is entitled to great deference with respect to its factual findings and it is not the function of this court on review to reweigh the evidence." *Id.* The factors Elgin relies on are just a few of many factors to be considered in evaluating proposed routes and no one factor is more important than the others. *Id.* ¶ 55. Here, the record contains sufficient evidence to support the Commission's decision.

¶ 53 Finally, Elgin argues that the Commission's order did not address the finding in the ALJs' proposed order that "it was not clear from the record that the route is equitable to all customers or is the least-cost method of achieving the statutory objectives." However, the Commission is not bound by an ALJ's proposed order, as such orders are considered only "recommended" or "tentative." 220 ILCS 5/10-111 (West 2012). The Commission found that the Project would reduce congestion and result in lower electric costs for customers. It also concluded that the potential cost savings were greater than the expected cost of the Project. The Commission also found credible the evidence that the Project had been chosen as the best solution among nine alternatives. Kaup's testimony indicated that the primary route represented the best combination of engineering feasibility, least-cost, and lowest impact on the surrounding areas. As such, despite the ALJs' proposed order, there was evidence to support the Commission's conclusion that the Project was the least-cost means of satisfying the statutory objectives.

¶ 54                                    D. The Staff's Alleged Failure to Investigate

¶ 55 Elgin's final contention on appeal is that the Staff failed to adequately investigate or consider the issues of good cause and least-cost. In so arguing, Elgin relies on *Citizens United for Responsible Energy Development, Inc. (CURED) v. Illinois Commerce Comm'n*, 285 Ill. App. 3d 82 (1996). In that case, a municipal energy agency sought Commission approval under

section 8-406 of the Act (220 ILCS 5/8-406 (West 1994)) for a new transmission line that would enable it to provide electric service to the city of Highland. The reviewing court reversed the Commission's decision granting a certificate of public convenience and necessity to the agency, because the conclusion that the proposed transmission line was the least-cost means of satisfying the customers' service needs was "without sufficient basis and substantial foundation." *CURED*, 285 Ill. App. 3d at 91. The reviewing court noted that the Commission's economist had specifically testified that he was told not to address the issue of least-cost means. *Id.* The reviewing court further noted that the evidence raised questions as to whether the proposed transmission line constituted the least-cost means. *Id.* at 93. The reviewing court expressed concern that the agency was obligated to pay only a fixed amount for construction of the transmission line, with the city to bear the remainder of the cost. In the court's view, the agency was insulated from increased costs and lacked "any real or substantial interest in choosing the least-cost-means method of transmitting electricity." *Id.*

¶ 56 *CURED* is distinguishable from the present case. In this case, ComEd will bear the burden for the cost of the Project and therefore has a substantial interest in choosing the least-cost means of completing the Project. Additionally, at issue in *CURED* was section 8-406 of the Act, which required that cost or cost savings be given "primary weight" when determining whether to grant a certificate of public convenience and necessity. 220 ILCS 5/8-406(d) (West 1994). In this case, section 8-406.1 does not require that cost be given primary weight. See *Adams County*, 2015 IL App (4th) 130907, ¶ 55.

¶ 57 Furthermore, unlike in *CURED*, there was evidence in this case that the Staff did consider the issues of good cause and least-cost. The record indicates that the Staff conducted discovery, presented evidence, and filed pleadings and briefs on the relevant issues. The Commission stated that its least-cost determination was based on the cost-benefit analysis conducted by the Staff. In

its brief on exceptions, the Staff stated that it was "of the view that the record evidence indicates that the Project is equitable to all customers and is the least-cost method of achieving the statutory objectives." In his rebuttal testimony, Zuraski testified that he was an economist and had conducted a cost-benefit analysis of the Project. He concluded that the Project was likely to be beneficial to Illinois consumers by a wide margin and that the Project met the requirements of section 8-406.1(f) of the Act. As to good cause, Rashid testified that the primary and alternate routes for the Project were satisfactory and had no features that should preclude their use. He also opined that ComEd had met the requirements of section 8-406.1(a)(1) of the Act, which included the requirement of showing "good cause" for failing to identify alternate rights-of-way. 220 ILCS 5/8-406.1(a)(1) (West 2012).

¶ 58 Finally, in *CURED* the reviewing court found that the record raised questions as to whether the proposed transmission line was the least-cost means. *CURED*, 285 Ill. App. 3d at 93. In this case, in addition to the Staff's determinations, there was other evidence to support the Commission's findings of least-cost and good cause.

¶ 59                                   CONCLUSION

¶ 60    For the reasons stated, we affirm the Commission's judgment.

¶ 61    Affirmed.