2023 IL App (3d) 220108

Opinion filed April 12, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| PEMBROKE ENVIRONMENTAL JUSTICE COALITION; BLACKS IN GREEN; GREEN POWER ALLIANCE; and ENVIRONMENTAL DEFENSE FUND OF ILLINOIS, | ) ) ) ) ) ) | Petition for Review of Orders of the Illinois Commerce Commission. Docket No. 21-0698 |
| Petitioners, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0108 |
| THE ILLINOIS COMMERCE COMMISSION; NORTHERN ILLINOIS GAS COMPANY, d/b/a Nicor Gas Company; THE COUNTY OF KANKAKEE, ILLINOIS; and THE VILLAGE OF HOPKINS PARK, ILLINOIS, | ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Peterson and Davenport concurred in the judgment and opinion.

**OPINION**

¶ 1    Following the enactment of legislation designed to facilitate the expansion of natural gas distribution services to Pembroke Township in Kankakee County, Northern Illinois Gas Company, doing business as Nicor Gas Company (Nicor), filed a petition with the Illinois Commerce Commission (Commission) seeking a certificate of public convenience and necessity (CPCN)

authorizing it to provide such services. Several interested organizations, including Pembroke Environmental Justice Coalition, Environmental Defense Fund of Illinois, and Blacks in Green[1] (collectively, Intervenors), intervened, arguing the petition should be denied. The Commission ultimately granted Nicor's petition and awarded it a CPCN; it subsequently denied the Intervenors' application for rehearing. The Intervenors filed a petition for review with this court, arguing the Commission misapplied various provisions of the Pembroke legislation and made findings that were insufficiently supported. For the reasons that follow, we affirm.

¶ 2                                      I. BACKGROUND

¶ 3          The following is derived from the record on appeal. In August 2021, the Illinois General Assembly enacted the Pembroke Township Natural Gas Investment Pilot Program Act (220 ILCS 85/1 *et seq.* (West Supp. 2021)) and amended the State Finance Act (30 ILCS 105/5.935 (West Supp. 2021) and the Public Utilities Act (Utilities Act) (220 ILCS 5/8-406, 8-406.2 (West Supp. 2021)) to create what we will refer to as the Pembroke Pilot Program. See Pub. Act 102-609 (eff. Aug. 27, 2021). Pembroke Township lies within Kankakee County. Prior to enactment of the program, the Chicago Tribune reported that Pembroke Township residents relied on propane, wood-burning stoves, and electrical space heaters to keep warm. John Keilman, *Residents of Impoverished Pembroke Township Live Without Natural Gas Heat. Now Jesse Jackson Is Joining the Push to Bring a Pipeline to the Community.*, Chi. Tribune (Dec. 16, 2019, 7:42 p.m.), https://www.chicagotribune.com/news/breaking/ct-pembroke-nicor-gas-jackson-20191217-3lxvyxklwvgshfbxznbh3t5gyy-story.html [https://perma.cc/3K85-KYS3]. In 2019, Mayor Mark Hodge of the Village of Hopkins Park (which lies within Pembroke Township) reached out to community leaders to help secure access to natural gas in the township by brokering an agreement

---

[1]Green Power Alliance, a program of Blacks in Green, is also listed as a party.

between Nicor and state agencies, describing natural gas access as "critical for economic development." *Id.* Dr. Rodney Alford, a physician who previously worked in the community, opined that bringing natural gas to Pembroke Township was " 'more of a health issue,' " while Mark Baines, Pembroke Fire Protection District chief, explained that malfunctioning electrical space heaters cause fires in the community, especially in mobile homes. *Id.*

¶ 4        In response to the outreach, Reverend Jesse Jackson Sr. sent a letter to Nicor president Melvin Williams. Jackson explained that Pembroke Township residents "lack heat and access to basic necessities" and "[e]nsuring access to utilities like natural gas, safe drinking water and broadband will help fight poverty and build this community." Jackson continued:

"These families have been subjected to substandard and inhumane living conditions, forced to use energy products that often cause fires and health issues from smoke or burns. ***

*** And while policy and regulatory solutions are being considered in the United States at the federal, state, and local levels, we must not forget those communities that lack access to natural gas—an energy product that is much more clean and green than what they are currently using."

Accordingly, in 2020, Hodge, Jackson, the Rainbow Push Coalition, Illinois State Senator Patrick Joyce, and other local and state leaders formed a steering committee to bring natural gas to the township. Senator Joyce sponsored the bill proposing the program.

¶ 5        Shortly after the creation of the Pembroke Pilot Program, on September 16, 2021, Nicor filed a petition for a CPCN pursuant to the recently enacted section 8-406.2 of the Utilities Act (220 ILCS 5/8-406.2 (West Supp. 2021)), seeking to construct, operate, and maintain approximately 34.7 miles of new gas distribution main and related facilities in portions of

3

Pembroke Township. The petition stated that residents of the Village of Hopkins Park had expressed interest in receiving natural gas service. The petition also sought extension into St. Anne Township, for which Nicor already had authority. Several interested organizations intervened.

¶ 6      In its petition, Nicor asserted that it had surveyed 523 prospective customers in the Hopkins Park area to gauge interest in converting to natural gas and received 279 responses, of which 270 expressed interest (97%). Its proposed project would cost an estimated $11.9 million, less than the upper limit allowed by statute, and was the least-cost means of providing the proposed service. The project would include "construction and installation of approximately 13,500 feet of 8[-inch] steel main, 37,200 feet of 6[-inch] polyethylene ('PE') main, 40,000 feet of 4[-inch] PE main, and 92,300 feet of 2[-inch] PE main, plus services, meters and regulators." Nicor stated it was the only public utility with gas facilities near Hopkins Park with sufficient available capacity to meet future needs.

¶ 7      Nicor further provided that its project would be installed in phases, would require acquisition of enumerated permits and easements, would "not result in the permanent conversion of any cropland, pastureland, or forested land to non-agricultural use," and was necessary and appropriate for Pembroke Township. Nicor stated it could finance the project without significant adverse financial consequences to customers, noting its "sound financial condition" and "history of strong investment credit ratings." Further, it could maintain reliable and efficient service while supplying gas from "existing gas supply contracts and from existing underground storage capacity."

¶ 8      Nicor submitted a declaration by Lewis M. Binswanger, vice president of external affairs, stating that Nicor held two public meetings in the community as required by the Utilities Act. The declaration provided, in relevant part:

4

"6. Due to limitations on in-person gatherings necessitated by the ongoing COVID-19 pandemic, Nicor Gas held two virtual meetings regarding the Hopkins Park main extension on September 8 and 9, 2021 that were scheduled from 9:30-11:00 a.m.

7. Nicor Gas provided notice of these meetings through multiple forms of communication, including an informational letter mailed to more than 500 local addresses, informational fliers delivered to residential areas in and around Hopkins Park that were accessible by foot, posted signage across Pembroke Township (printed in both English and Spanish), a dedicated page on Nicor Gas' website (www.nicorgas.com/pembroke), and social media posts on the Village of Hopkins Park Facebook page. Exhibit A to this declaration is a group exhibit containing copies or images of certain forms of the notice provided.

8. At the public meeting held on September 8, 2021, two individuals provided comments, and at the public meeting held on September 9, 2021, ten individuals provided comments.

9. At both public meetings, I spoke on behalf of Nicor Gas to provide an introductory overview of the Hopkins Park main extension. In addition, a moderator called upon individual attendees to provide comments in the order in which they expressed an intention to speak or to provide written comments. Nicor Gas considered the public input from these virtual meetings in connection with the Hopkins Park main extension."

Nicor also submitted testimony from Marie LaPorte, director of customer solutions, who detailed efforts by Nicor and the steering committee, and an exhibit indicating that 19 steering committee meetings took place between 2020 and 2021. Various Nicor employees and members of the

5

Rainbow PUSH Coalition, as well as Senator Joyce and other local officials, were listed as invitees to the committee meetings.

¶ 9        The Intervenors each filed verified petitions to intervene that were granted. The Commission and the Intervenors filed direct testimony, and Nicor filed rebuttal testimony. Nicor and the Intervenors filed cross exhibits; the Commission filed declarations; and Nicor filed declarations. The administrative law judge conducted an evidentiary hearing on November 9, 2021. The Commission, Nicor, and the Intervenors thereafter filed briefs and replies. The thrust of the Intervenors' opposition was that Nicor failed to satisfy the statutory criteria because it did not establish it could safely manage the proposed project, it did not consider costs to prospective customers, and it did not properly consider community input.

¶ 10        The Commission entered its final order on January 5, 2022, granting Nicor's request for a CPCN. The Intervenors filed a petition for rehearing raising additional evidence, which was denied on February 17, 2022.

¶ 11        The Intervenors timely appealed.

¶ 12                                II. ANALYSIS

¶ 13        The Intervenors contend the Commission misinterpreted and misapplied various provisions of Public Act 102-0609 (eff. Aug. 27, 2021) when it granted Nicor's petition for a CPCN. Accordingly, this appeal requires us to construe the portion of Pembroke Pilot Program codified at section 8-406.2 of the Utilities Act (220 ILCS 5/8-406.2 (West Supp. 2021))

¶ 14        The Pembroke Pilot Program "is intended to provide a mechanism by which a gas public utility may extend its service territory and gas distribution system to provide service to designated low-income areas whose residents do not have access to natural gas service and must purchase more costly alternatives to satisfy their energy needs." *Id.* § 8-406.2(a). The program is limited to

6

Pembroke Township. *Id.* § 8-406.2(b). Subsection (c) lists requirements a utility must include in its application for a CPCN to distribute natural gas in the township (*id.* § 8-406.2(c)), while subsection (d) lists criteria a utility must satisfy to have an application granted (*id.* § 8-406.2(d)). Subsection (e) provides that "[t]he Commission shall issue its decision with findings of fact and conclusions of law granting or denying the application no later than 120 days after the application is filed." *Id.* § 8-406.2(e). Public Act 102-609 (eff. Aug. 27, 2021) also contemporaneously amended section 8-406(a) of the Utilities Act to further provide:

> "A certificate of public convenience and necessity requiring the transaction of public utility business in any area of this State shall include authorization to the public utility receiving the certificate of public convenience and necessity to construct such plant, equipment, property, or facility as is provided for under the terms and conditions of its tariff and as is necessary to provide utility service and carry out the transaction of public utility business by the public utility in the designated area." 220 ILCS 5/8-406(a) (West Supp. 2021).

¶ 15    The Intervenors argue the Commission erred first by failing to apply section 8-406 of the Utilities Act and granting Nicor a CPCN solely based on its compliance with section 8-406.2. Regarding the application requirements, they claim the Commission "misapplied the law and failed to support its decision with substantial evidence" when it found Nicor held two prefiling public meetings in the community and considered public input. See *id.* § 8-406.2(c)(6). They further contend the Commission made several findings in error, including that Nicor could efficiently manage and supervise the construction and that Nicor could finance the construction without significant adverse financial consequences to its customers and without exceeding the statutory allowable cost. See *id.* § 8-406.2(d)(3), (4), (5). Finally, the Intervenors claim the Commission erred in denying their application for rehearing.

¶ 16                                    A. Standard of Review

¶ 17        Our analysis begins with the text. "The objective of statutory interpretation is to ascertain and give effect to the legislature's intent, and the most reliable indicator of that intent is the language of the statute, given its plain and ordinary meaning." *Chicago Sun-Times v. Cook County Health & Hospitals System*, 2022 IL 127519, ¶ 26. "As a matter of legislative intent, *** more-specific statutes control over general acts." *McDonald v. Symphony Bronzeville Park, LLC*, 2022 IL 126511, ¶ 45. We may consider the reason for the law, the problem the law addresses, the goal desired, and the consequences of construing a statute one way or another. *O'Connell v. County of Cook*, 2022 IL 127527, ¶ 21; *Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 27.

¶ 18        We presume each part of a statute has meaning and avoid construing a statute so as to render a portion superfluous or redundant. *People v. Salem*, 2016 IL 118693, ¶ 16. We presume the legislature did not intend absurd results and that a literal reading leading to an absurd result should yield to a reasonable interpretation. *O'Connell*, 2022 IL 127527, ¶ 22; *Evans*, 2021 IL 125513, ¶ 27; see also *Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund of Chicago*, 155 Ill. 2d 103, 110 (1993) ("A statute capable of two interpretations should be given that which is reasonable and which will not produce absurd, unjust, unreasonable or inconvenient results that the legislature could not have intended."). We must also avoid an interpretation that would render a statute insignificant, meaningless, inoperative, or nugatory. *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 39. Nevertheless, "[w]hen the language of the rule is clear and unambiguous, we will apply the rule as written without resort to further aids of statutory construction." *McCarthy v. Taylor*, 2019 IL 123622, ¶ 17.

¶ 19                                B. Section 8-406 Does Not Apply

¶ 20        The Commission rejected the Intervenors' argument that section 8-406.2 of the Utilities

Act created new criteria a utility must satisfy to obtain a CPCN *in addition to* the requirements under section 8-406. The Intervenors again argue section 8-406 applies to CPCNs generally, including activity covered by section 8-406.2, and thus that a utility-applicant under section 8-406.2 must satisfy both sections. Importantly, they insist subsection (d) of section 8-406 applies, which attaches primary weight in the analysis to customer costs. See 220 ILCS 5/8-406(d) (West Supp. 2021). The Commission determined it did not. Rather, the Commission concluded that section 8-406.2 unambiguously gave the Commission authority to grant a CPCN to serve designated hardship areas without considering other portions of the Utilities Act. In support it noted that section 8-406.2 was created specifically for the Pembroke area. See Pub. Act 102-609 (eff. Aug. 27, 2021).

¶ 21 Whether a utility must satisfy the requirements of section 8-406 of the Utilities Act to obtain a CPCN under section 8-406.2 presents a question of law. Courts are not bound by Commission rulings on questions of law, which we review *de novo*. *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29. We agree with the Commission that Nicor was not required to satisfy section 8-406 of the Utilities Act.

¶ 22 Sections 8-406 and 8-406.2 of the Utilities Act both establish criteria a utility must satisfy to obtain a CPCN, but section 8-406.2 is directed to a much narrower class of activity than section 8-406. Under the former, a utility may apply for a CPCN to distribute natural gas to Pembroke Township (a " '[d]esignated hardship area' ") through an expedited procedure (220 ILCS 5/8-406.2(b) (West Supp. 2021)), whereas under the latter, a utility may apply to transact "public utility business in any area of this State" (*id.* § 8-406(a)). *Cf. City of Elgin v. Illinois Commerce Comm'n*, 2016 IL App (2d) 150047, ¶ 3 (explaining that "the legislature enacted section 8-406.1 of the Act (220 ILCS 5/8-406.1 (West 2012))" to "provid[e] an expedited procedure for a public utility to

9

apply for a certificate when seeking to construct a new high-voltage electric-service line and related facilities"). The narrower provision contains mandatory language that the broader provision does not. Section 8-406.2 provides that the Commission "shall" grant a CPCN if it finds the enumerated criteria are satisfied. 220 ILCS 5/8-406.2(d) (West Supp. 2021). Section 8-406.2(c) requires the Commission to grant or deny an application within 120 days. *Id.* § 8-406.2(e). In contrast, section 8-406 provides that the Commission "shall have the power to issue" a CPCN to a public utility for the "transaction of public utility business in any area of this State" or begin "new construction" whenever it makes a requisite determination (*id.* § 8-406(a), (b)) and section 8-406(e) provides that the Commission "may issue" a temporary CPCN to a CPCN applicant pending review "to assure maintenance of adequate service or to serve particular customers" (*id.* § 8-406(e)).

¶ 23 The mandatory language in section 8-406.2(d) furthers the section's purpose, which is "to provide a mechanism by which a gas public utility may extend its service territory and gas distribution system to provide service to designated low-income areas whose residents do not have access to natural gas service and must purchase more costly alternatives to satisfy their energy needs." *Id.* § 8-406.2(a). The section is limited in operation to the extension of a public utility's gas distribution system to Pembroke Township. *Id.* § 8-406.2(b), (c). Accordingly, the text shows that section 8-406.2 is intended to facilitate the extended distribution of less costly natural gas to a narrow class, Pembroke Township residents, whereas section 8-406 is intended to regulate new business by public utilities generally. We infer the General Assembly intended to streamline the process for a public utility to expand its natural gas distribution into Pembroke Township for the benefit of its low-income residents by creating an independent means of obtaining a CPCN for this limited purpose. *Cf. Elgin*, 2016 IL App (2d) 150047, ¶ 56 (noting section 8-406(d) does not apply

10

to petition for CPCN filed under section 8-406.1).

¶ 24     The Utilities Act's structure further supports this inference. Sections 8-406 and 8-406.2 contain overlapping requirements, suggesting the legislature intended they be read independently. Both sections require a gas utility to show that the proposed new construction would provide "adequate, reliable, and efficient" service, the project is the "least cost" means of providing the service, the utility "is capable of efficiently managing and supervising" construction, and the utility can finance construction "without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8-406(b), 8-406.2(d)(1)-(4) (West Supp. 2021). Section 8-406, in addition, provides that "the Commission shall attach primary weight to the cost or cost savings to the customers of the utility" in considering whether to issue a CPCN. *Id.* § 8-406(d).

¶ 25     Section 8-406.2 does not direct the Commission to attach primary weight to customer costs, though customer costs do enter the analysis. It instead requires the utility to disclose to the Commission the cost for prospective customers to use its gas services and to guarantee that any residents who opt out will not be assessed any charges related to the project. *Id.* § 8-406.2(d)(6), (8). As another safeguard to customer costs, the utility must also show its estimated costs fall below a statutorily derived amount. *Id.* § 8-406.2(d)(5). Had the General Assembly intended that the customer cost criteria of section 8-406 apply, much of the criteria in section 8-406.2 would be redundant.

¶ 26     The Intervenors respond to the structural similarity between the requirements of sections 8-406 and 8-406.2 by noting several differences. Specifically, under section 8-406, the Commission is required to determine if the proposal is "necessary" and "equitable" (*id.* § 8-406(b)(1)) as well as "attach primary weight to the cost or cost savings to the customers of the utility" (*id.* § 8-406(d)). They argue that the absence of these requirements in section 8-406.2

11

indicates that both sections must apply because customer costs are more crucial in a designated hardship area. But this argument proves too much because it presumes, without support, that the requirements of section 8-406 are in some way fundamental to the ability of a utility to obtain a CPCN. The more straightforward conclusion, and the one that avoids rendering part of the statutory scheme redundant, is that the two sections were meant to be read and applied separately.

¶ 27    The Intervenors argue the legislature did not expressly exempt section 8-406.2 petitioners from complying with section 8-406, that each section applies on its face, and thus the legislature intended that they work together. They also point to other subsections which explicitly exempt projects from the general requirements of section 8-406(b) to show the legislature did not intend the same with section 8-406.2. For the reasons expressed above, we conclude that section 8-406.2 is clear and unambiguous in creating a narrow, independent means for a utility to obtain a CPCN.

¶ 28    The Intervenors next suggest the Commission construed section 8-406.2 to operate independently because the Commission sought to improperly remedy what it saw as a statutory oversight. We reject this argument because our analysis of the text refutes any suggestion that the legislature made an oversight.

¶ 29    The Intervenors next argue the two sections must be applied together because section 8-406 provides certain protections to CPCN holders and the public that are not available under section 8-406.2; construing them separately here, they contend, would produce the absurd and inconvenient result that Nicor could not avail itself of those protections. For instance, under section 8-406, an applicant is eligible to receive a temporary CPCN (*id.* § 8-406(e)), a CPCN holder may apply to modify its existing CPCN (*id.* § 8-406(f)), and no CPCN may be construed as granting an exclusive privilege, immunity, or franchise (*id.*). The same protections are not available under section 8-406.2. Thus, they argue, it would be absurd to conclude that section 8-406 does not apply.

12

¶ 30　　　　We disagree, as the Intervenors overlook key details of the statute. As to an application for a CPCN under section 8-406.2, the Commission "shall" grant or deny within 120 days after filing and "shall" grant a CPCN if it finds the requisite criteria are satisfied. *Id.* § 8-406.2(d), (e). Section 8-406, however, imposes no mandate on when the Commission must issue its decision or grant a CPCN. See *id.* § 8-406. The timeline for a decision under section 8-406.2 obviates the need to apply for a temporary CPCN, and the mandatory language with respect to granting an application obviates the need for a modification procedure because a gas utility could, presumably, file another application and expect the Commission to grant or deny it within 120 days. Nothing in the text of section 8-406.2 suggests that filing a subsequent application for a CPCN under either section is prohibited. If Nicor is not prohibited from filing a subsequent application, we can find no support in the record for any claim that denying Nicor the protections under section 8-406 somehow disadvantages it such that we should conclude the legislature intended that section 8-406 should apply here.

¶ 31　　　　The Intervenors also contend Nicor filed its application "pursuant to Section 8-406(a)," thereby recognizing it needed to satisfy that section. But the amendment to section 8-406(a) is not specific to Pembroke Township, as is section 8-406.2—it merely clarifies which activities a CPCN authorizes. Such a clarification does not suggest section 8-406 as a whole is applicable to the instant proceeding.

¶ 32　　　　Finally, the Intervenors assert that "without Section 8-406, Section 8-406.2 would have no requirement of 'necessity' for a CPCN. Section 8-406(b)(1) contains that requirement, and an application for a CPCN without it would lead to a clearly absurd result." This states a conclusion without stating its premise—the hidden premise being that "necessity" *must* be a statutory requirement for a utility to obtain a CPCN, otherwise any result would be absurd. The Intervenors

13

offer no authority to support their implied premise, thus we disregard the assertion. More fundamentally, by enacting section 8-406.2 in support of facilitating bringing natural gas to the Pembroke area, the legislature has determined the necessity.

¶ 33 The relevant legislative history removes any lingering doubt that section 8-406 does not apply. Illinois enacted a public utilities act in 1913 that established a process by which a utility may obtain a CPCN. Ill. Rev. Stat. 1915, ch. 111a, ¶ 55; see *State Public Utilities Comm'n v. Noble Mutual Telephone Co.*, 268 Ill. 411, 412 (1915). That general process is now codified in section 8-406 of the Utilities Act. 220 ILCS 5/8-406(b) (West 2020); Pub. Act 84-617, § 1 (eff. Jan. 1, 1986). Section 8-406.2, however, was created *sui generis* for low-income residents in the Pembroke Township area relying on inferior sources of energy. See 220 ILCS 5/8-406.2(a), (b) (West Supp. 2021); *supra* ¶¶ 3-4. Holding that an applicant must satisfy both sections would undermine the purpose of expanding access to affordable energy.

¶ 34 C. Application of Section 8-406.2

¶ 35 Next, the Intervenors contend the Commission misapplied section 8-406.2 of the Utilities Act when it granted Nicor's petition. The parties both argue the governing standard is whether the agency decision was clearly erroneous. When agency decisions are subject to the Administrative Review Law (735 ILCS 5/art. III (West 2020)), mixed questions of law and fact are reviewed for clear error. See *Cooke v. Illinois State Board of Elections*, 2021 IL 125386, ¶¶ 49-50 (standard permits reversal only where reviewing court has " 'a definite and firm conviction that a mistake has been made' "); *Board of Education of the City of Chicago v. Moore*, 2021 IL 125785, ¶ 17 (board of education decisions subject to Administrative Review Law); *WISAM 1, Inc. v. Illinois Liquor Control Comm'n*, 2014 IL 116173, ¶ 24 (Illinois Liquor Control Commission decisions subject to Administrative Review Law). Review of a decision by the Commission, however, is

14

governed by the Utilities Act. See 220 ILCS 5/10-201(e) (West 2020); *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 22.

¶ 36        Our review is limited to "(1) whether the Commission acted within its authority; (2) whether it made adequate findings to support its decision; (3) whether the decision was supported by substantial evidence; and (4) whether state or federal constitutional rights were infringed." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009); 220 ILCS 5/10-201(e)(iv) (West 2020). But a party may also challenge a decision generally on the ground it violated the Utilities Act. *Madigan*, 2015 IL 116005, ¶ 21.

¶ 37        Any order or decision by the Commission shall be held *prima facie* reasonable, and on appeal, the party appealing a Commission decision bears the burden of proof to show it is unreasonable. 220 ILCS 5/10-201(d) (West 2020); *Madigan*, 2015 IL 116005, ¶ 22. "The Commission's interpretation of the Act is accorded deference because administrative agencies enjoy wide latitude in effectuating their statutory functions." *Madigan*, 2015 IL 116005, ¶ 22 (citing *Commonwealth Edison*, 398 Ill. App. 3d at 514); see also *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill. 2d 391, 397 (1998) ("Indeed, the Commission is entitled to great deference because it is an administrative body possessing expertise in the field of public utilities."). Such deference extends to an interpretation of an ambiguous statute. *Commonwealth Edison*, 398 Ill. App. 3d at 514 (citing *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)). Deference to the Commission is especially important where the General Assembly has entrusted the Commission with authority to approve new utility programs. See *Madigan*, 2015 IL 116005, ¶¶ 23, 25 (affording "substantial deference" to the Commission's determination that a new utility rate program was part of a just and reasonable rate). This is because consideration of new utility programs requires sound business judgment and

15

depends largely upon the Commission's expertise and experience. *Id.* ¶ 23. Only where the Commission departs from its usual rules of decision will its ruling be given less deference. *Id.* ¶ 25. Otherwise, we review the decision for an abuse of discretion. *Id.*; *contra Cooke*, 2021 IL 125386, ¶ 50 (clear error standard permits reversal only where reviewing court has " 'a definite and firm conviction that a mistake has been made' ").

¶ 38     The Commission was charged with interpreting a statute within its purview (utility regulation). Just as the Commission utilizes its expertise when it determines whether a rate is just and reasonable (*cf. Madigan*, 2015 IL 116005, ¶ 23), it utilizes its expertise when it determines whether a utility can satisfy the criteria of section 8-406.2. Those criteria are, to some extent, ambiguous in that they incorporate broad, imprecise language. See 220 ILCS 5/8-406.2(d)(2) (West Supp. 2021) ("the proposed hardship area facilities will provide adequate, reliable, and efficient gas delivery service"); *id.* § 8-406.2(d)(3) ("the public utility is capable of efficiently managing and supervising the construction of the hardship area facilities and has taken sufficient action to ensure adequate and efficient construction and supervision of the construction"); *id.* § 8-406.2(d)(4) ("the public utility is capable of financing the construction of the hardship area facilities without significant adverse financial consequences for the utility or its customers"). "If further construction of a statute is necessary, a court may consider similar and related enactments." *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 25; see also *Relf v. Shatayeva*, 2013 IL 114925, ¶ 23 ("In construing that language, words and phrases should not be considered in isolation. Rather, the language in each section of the statute must be examined in light of the statute as a whole, which is construed in conjunction with other statutes touching on the same or related subjects."). Courts ascertaining legislative intent may also consider the purpose for the provision. *Hartney Fuel Oil Co.*, 2013 IL 115139, ¶ 25.

16

¶ 39 Here, the Intervenors do not contend the Commission departed from its usual rules of decision. Accordingly, we review the Commission's determinations for an abuse of discretion.

¶ 40                                                    1. Section 8-406.2(c)(6)

¶ 41 The Intervenors contend the Commission misapplied section 8-406.2(c)—in that it failed to support its decision with substantial evidence—when it found that Nicor's public meetings satisfied the statutory requirements and that "there [are] no specific requirements for the pre-filing meetings." The appellate court shall reverse an order by the Commission if its findings are not supported by substantial evidence based on the entire record. 220 ILCS 5/10-201(e)(iv)(A) (West 2020). "The substantial-evidence standard is the same as the manifest-weight standard." *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 37. An order is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 95.

¶ 42 A public utility may apply for a CPCN to distribute gas in Pembroke Township under section 8-406.2(c) of the Utilities Act. 220 ILCS 5/8-406.2(c) (West Supp. 2021). Such application "shall include" six requirements, including "a statement to confirm that the public utility has held at least 2 pre-filing public meetings in the community and considered public input from those meetings when developing and implementing its plans." *Id.* § 8-406.2(c)(6). The Intervenors contend that the Commission's finding that Nicor satisfied section 8-406.2(c)(6) was unsupported by substantial evidence.

¶ 43 Nicor initially suggests that the pre-filing-public-meeting requirement is not reviewable on appeal. ("[The Intervenors' position] is that the statement Nicor Gas provided to the Commission regarding the meetings was false. Whether that is even relevant, the Commission's factual finding to the contrary is supported and not subject to reversal on administrative review.") Alternatively,

17

Nicor suggests the required meetings need not satisfy any objective criteria as to notice or substance: the only requirement is that they occur. ("Yet these criticisms of how these meetings were noticed and conducted are unmoored from the Section's requirement that they occur and thus they are of no moment.") Nevertheless, Nicor maintains that the record shows it conducted its pre-filing public meetings in a manner consistent with section 8-406.2(c)(6) and that it considered public input. In support that it considered public input, LaPorte testified,

> "Nicor Gas held two virtual meetings where public comments were taken and subsequently considered. The Company promoted these meetings via direct mailings to residents in the community, placards and signs placed around the community, and through digital channels as well. In addition to those meetings, Nicor Gas has engaged in a series of in person meetings in the community to help inform and educate residents about the Company's proposal. *** Nicor Gas has been very active in providing opportunities to engage with the Hopkins Park/Pembroke Township community, and the Company's actions are consistent with its normal business practices when extending service to a new area."

Further, Nicor determined that none of the public comments it received necessitated changes to its proposal, as demonstrated by the Binswanger declaration.

¶ 44 Although, as noted by the Commission, section 8-406.2 imposes no specific requirements, we disagree with the suggestion that the meetings need not satisfy any objective criteria. Section 8-406.2 was proposed in February 2021 and was debated in April 2021. As originally introduced, section 8-406.2(c) would have provided that an application for a CPCN shall include "a statement indicating that the gas distribution utility has received written indications of interest from at least 50% of the customers within the boundaries of the designated hardship area demonstrating an interest shown in obtaining gas service." 102d Ill. Gen. Assem., House Bill 3404, 2021 Sess. (as

18

introduced on Feb. 22, 2021); see 102d Ill. Gen. Assem., House Proceedings, Feb. 22, 2021, at 4. During the legislative session, Representative Harper argued that Pembroke Township residents did not actually want a new pipeline project; rather, the mayor of Hopkins Park lobbied for it and the residents were not adequately included in the legislative process. 102d Ill. Gen. Assem., House Proceedings, April 15, 2021, at 94-96 (statements of Representative Harper). Representative Didech also expressed concern that residents did not fully support the legislation. *Id.* at 88 (statements of Representative Didech). The bill was passed in the House and sent to the Senate. *Id.* at 98. There, the bill was amended and passed. 102d Ill. Gen. Assem., Senate Proceedings, May 28, 2021, at 87. The subsection containing the written-indications-of-interest requirement was ultimately removed, and subsection (c)(6) of section 8-406.2 (the prefiling-public-meeting requirement) was added. 102d Ill. Gen. Assem., House Bill 3404, 2021 Sess. (Senate Amendment 1 filed May 13, 2021); Pub. Act 102-609 (eff. Aug. 27, 2021).

¶ 45 This change, coupled with the legislators' comments, suggests the legislature became less concerned with whether a utility-applicant could show sufficient interest from residents and more concerned with ensuring a utility-applicant meaningfully solicits public input. Construing subsection (c)(6) to impose no formal requirements as to how public meetings in the community occur would be inconsistent with the legislature's concerns, thus we infer the legislature intended that meetings meet certain minimum requirements.

¶ 46 As to what those requirements are, the Intervenors first argue that Nicor's prefiling meetings were inadequate because there was insufficient public notice, the format was largely inaccessible to local residents, and the meeting's moderator limited public participation. They cite the Illinois Pollution Control Board's guidance for community relations plans and a local resident's testimony about the community to show that Nicor's procedure gave the public insufficient notice.

19

They assert that Nicor's virtual meetings did not occur "in the community" as required by statute because they were held virtually and broadband internet access necessary to participate was unavailable in Pembroke Township at that time.

¶ 47    Second, they claim Nicor did not consider public input because Nicor filed its petition for a CPCN 20 days after Public Act 102-609 became effective and 1 week after its public meetings, thus indicating Nicor did not actually consider public input in developing its plans. The Intervenors argue that "[i]t is impossible to find that Nicor considered public input concurrently with plan development (*i.e.* 'when developing') given those plans were developed *before* community meetings occurred." (Emphasis in original.)

¶ 48    We disagree with the Intervenors' rigid understanding as to what it means for an entity to be "developing" its plans. See 220 ILCS 5/8-406.2(c)(6) (West Supp. 2021) (CPCN application "shall include ***: *** (6) a statement to confirm that the public utility has held at least 2 pre-filing public meetings in the community and considered public input from those meetings *when developing and implementing its plans*." (Emphasis added.)). When used as a verb, "develop" can mean "to create or produce especially by deliberate effort over time" or "to cause to evolve or unfold gradually: to lead or conduct (something) through a succession of states or changes each of which is preparatory for the next." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/develop (last visited Mar. 31, 2023) [https://perma.cc/X66P-HTXK]. Develop thus may connote a process, and we discern no intent by the legislature to exclude that possible interpretation. Accordingly, an entity may consider public input "when developing" plans by reflecting on an earlier draft in light of public comments and making editorial decisions as part of an overall process, even if the decision is to make no changes.

¶ 49    The Intervenors nevertheless argue that by including subsection (c)(6), the legislature

intended to ensure *meaningful* public input and "surely intended for potential customers to at least have their questions addressed." They claim Nicor's mere statement that it considered public input was insufficient because Nicor did not alter its proposal after the meetings and emphasize that section 8-406.2 was amended prior to enactment to add subsection (c)(6). The Intervenors further assert that Nicor (1) provided insufficient notice to Pembroke Township residents about its meetings, (2) held the meetings at inconvenient times (9:30 a.m. on back-to-back weekdays) and in an inconvenient format (virtually, despite limited broadband access in Pembroke Township), (3) failed to provide residents with "sufficiently detailed and objective information on the project so as to provide material input," and (4) refused (or was unable) to answer residents' questions about the costs to convert their homes and businesses to natural gas and about community impact. Nicor's failures, they argue, show it did not meaningfully consider public input.

¶ 50    Section 8-406.2(c)(6) requires a public utility to provide "a statement" confirming that it held "2 pre-filing public meetings in the community and considered public input." 220 ILCS 5/8-406.2(c)(6) (West Supp. 2021). In contrast, section 8-406.1 of the Utilities Act (allowing a public utility to apply for a CPCN "for the construction of any new high voltage electric service line and related facilities") requires "[i]nformation showing" the applicant utility has held "3 pre-filing public meetings" and provides specific notice requirements. 220 ILCS 5/8-406.1(a)(3) (West 2020). Section 8-406.2 does not define "public meeting in the community," making that term ambiguous. While the legislature certainly intended meetings and public input, the exact format is left open. Notwithstanding, we agree with the Commission that the steps taken by Nicor to effectuate its section 8-406.2(c) obligations were sufficient.

¶ 51    Cognizant of our deference to Commission interpretations, we consider whether Nicor's two prefiling public meetings were consistent with the purpose of section 8-406.2(c)(6). Although

the meetings did not physically occur within the geographical area of Pembroke Township, they were available to anyone in the public with Internet access. *Cf.* 5 ILCS 120/1.02 (West 2020) (" '[m]eeting' [under the Open Meetings Act] means any gathering, whether in person or by video or audio conference, telephone call, *electronic means* \*\*\*, or other means of *contemporaneous interactive communication*" (emphases added)). According to its filings, Nicor announced the meetings by posting on the Village of Hopkins Park Facebook page, posting informational fliers and signage around Hopkins Park, mailing informational letters to more than 500 local addresses, and dedicating a page of its website to the project. Nicor provided these notices more than 48 hours in advance of the scheduled meetings. *Cf. id.* § 2.02(a) (public notice of any special meeting under the Open Meetings Act "shall be given at least 48 hours before such meeting"). Nicor conducted its meetings virtually on September 8 and 9, 2021 (from 9:30 a.m. to 11 a.m.), and 12 individuals provided public comments, which Nicor stated it considered. Moreover, while broadband access within Pembroke Township was limited, the Intervenors offer just one example of a resident who wanted to attend but was unable to (claiming she could not advance past the virtual waiting room), compared to the 12 individuals who provided public comments.

¶ 52 We conclude that substantial evidence supported the Commission's findings that Nicor "held at least 2 pre-filing public meetings in the community and considered public input from those meetings when developing and implementing its plans" (220 ILCS 5/8-406.2(c)(6) (West Supp. 2021)), and we cannot say the Commission abused its discretion.

¶ 53 2. Section 8-406.2(d) Criteria

¶ 54 The Intervenors also contend the Commission made several of its findings under section 8-406.2(d) in error. Section 8-406.2(d) provides as follows:

"The Commission shall, after notice and hearing, grant a [CPCN] under this Section if,

22

based upon the application filed with the Commission and the evidentiary record, the Commission finds that all of the following criteria are satisfied:

* * *

(3) the public utility is capable of efficiently managing and supervising the construction of the hardship area facilities and has taken sufficient action to ensure adequate and efficient construction and supervision of the construction;

(4) the public utility is capable of financing the construction of the hardship area facilities without significant adverse financial consequences for the utility or its customers;

(5) the estimated cost to construct and deploy the hardship area facilities is equal to or less than 250% of the amount allowed under the gas utilities then current tariffs to provide standard service to extend main and services[.]" *Id.* § 8-406.2(d).

Here, the Intervenors do not contend the Commission exceeded its authority, made inadequate findings to support its decision, made findings that were unsupported by substantial evidence, or infringed on constitutional rights. Nor do they contend the Commission departed from its usual rules of decision. Accordingly, we review the Commission's determinations for an abuse of discretion. We review each of these criteria in turn.

¶ 55                                     a. Subsection (d)(3)

¶ 56        Beginning with subsection (d)(3), the Intervenors argue (1) Nicor's history of safety violations indicate the Commission improperly determined Nicor could safely manage this project ("ensure adequate and efficient construction and supervision") and (2) Pembroke Township has unique physical and ecological characteristics and inadequate emergency services that make it "especially vulnerable in the event of a safety incident" such as a gas explosion or leak. They

23

contend that, because of known safety violations and an ongoing investigation by the Illinois Attorney General's Office (regarding underground gas storage facilities), the Commission was unable to assess whether Nicor could *safely* manage construction, thus it could not determine whether Nicor could "efficiently manag[e] and supervis[e] the construction." *Id.* § 8-406.2(d)(3). As to ecology, Pembroke Township is largely savanna and contains biodiversity that is "the result of generations of conscious, deliberate choices to forego infrastructure that could alter the land." Further, "even 'temporary' disturbances associated with construction will destroy soil composition and structure, eliminating ecosystem benefits to the public and generating uncompensated financial losses for farmers."

¶ 57    Nicor responds that the only evidence the Intervenors cite as to Nicor's past safety violations was the testimony of Jifunza Wright-Carter that Nicor was "under investigation" by the Illinois Attorney General's Office, an allegation that was "not relevant" and "unsupported." Nicor nevertheless acknowledges that it was the subject of a safety investigation into its underground storage facilities, as provided in the transcript of Wright-Carter's testimony before the Commission. It maintains, however, that this investigation was irrelevant.

¶ 58    The Intervenors reply that the Commission declined to consider evidence of Nicor's safety violations, inconsistent with the appellate court's decision in *Save Our Illinois Land*, 2022 IL App (4th) 210008. In *Save Our Illinois Land*, the appellate court considered whether a utility's past performance as a pipeline operator in a different state was relevant to the question of whether new pipeline structures were "necessary *** to promote the security *** of *** the public" in Illinois (220 ILCS 5/8-503 (West 2020)), concluding that such past performance was relevant. *Save Our Illinois Land*, 2022 IL App (4th) 210008, ¶ 122. "Particularly in light of the unique vulnerabilities of Pembroke and the potentially devastating risks of a leak or explosion," the Intervenors argue,

"a complete understanding of the Attorney General's investigation is necessary to make an informed determination" as to whether Nicor could efficiently manage and supervise the construction.

¶ 59 The Commission addressed this criterion—Nicor's ability to efficiently manage and supervise construction—as follows:

"Under Section 8-406.2(d)(3), the Commission is required to determine whether Nicor Gas can efficiently manage and supervise construction of this project. The Commission notes that Nicor Gas will comply with its own specifications, the Commission's rules and regulations and the Minimum Federal Pipeline Safety Standards. PEJC et al. is concerned about an investigation by the Attorney General's Office that relates to an underground storage facility. *The Commission points out that the operation of this underground storage facility is distinguishable from Nicor Gas' ability to efficiently manage this proposed construction project.* The Section 8-406.2(d)(3) requirement relates to the efficient management and supervision of the construction of the facilities and the Commission finds that Nicor Gas has the ability and the experience to manage this project. PEJC et al. also is concerned about the unique physical characteristics of Pembroke, as well as the lack of robust emergency services, which make it particularly vulnerable in the event of a safety incident. Nicor Gas explains that the Company maintains long stretches of rural pipeline, many of which are far from any homes or communities, and none of the concerns PEJC et al. raise are unique to Pembroke Township or would require additional or modified construction practices or procedures. The Commission agrees with Staff that based on the Company's history and operational capabilities, Nicor Gas is capable of efficiently managing and supervising this construction project and satisfies the

25

requirements of Section 8-406.2(d)(3)." (Emphasis added.)

Thus, the Commission rejected the Intervenors' underlying argument that Nicor did not satisfy section 8-406(d)(3).

¶ 60     We cannot say the Commission's consideration of Nicor's safety history or Pembroke Township's unique ecology was inadequate or an abuse of discretion. First, *Save Our Illinois Land* is inapposite because the Commission did not actually conclude that evidence of past safety violations was irrelevant; rather, it distinguished any underground storage safety issues from the construction project at issue. The text of section 8-406.2, moreover, rebuts any inference that the Commission was required to await the outcome of the Attorney General investigation. In contrast to the statute at issue in *Save Our Illinois Land*, section 8-406.2 does not use "safety," "security," or any other similar terms in the relevant statutory language. See 220 ILCS 5/8-406.2 (West Supp. 2021). The Commission is required to issue a decision within 120 days after an application is filed (*id.* § 8-406.2(e)), which would be impossible if it had to wait for an independent investigation to conclude.

¶ 61     The Intervenors do not otherwise elaborate why the Commission could not address the relevant question (whether "the public utility is capable of efficiently managing and supervising the construction") without knowing the results of an ongoing investigation. The General Assembly surely had the opportunity to consider Nicor's safety record and Pembroke Township's unique characteristics when it enacted Public Act 102-609 (eff. Aug. 27, 2021), specifically to facilitate distribution of natural gas by Nicor to Pembroke Township. See *supra* ¶¶ 3-4. The Commission's findings that Nicor would comply with relevant safety standards and that it could efficiently manage and supervise construction, based the company's history and operational capacities, are entitled to deference based on the Commission's expertise in the field of public utilities. See *supra*

¶¶ 37-38. The Intervenors do not explain why knowing the results of an investigation into underground gas storage is necessary to determine whether Nicor could efficiently manage and supervise construction of a pipeline project.

¶ 62 Nor do the Intervenors identify any relevant aspects of Nicor's safety history or Pembroke Township's unique ecology that were beyond the awareness of the General Assembly when it enacted Public Act 102-609. Their environmental objections do not pertain to specific aspects of Nicor's proposal, but to the expansion of natural gas facilities into Pembroke Township generally. The General Assembly rejected the notion that natural gas facilities are *per se* inappropriate for Pembroke Township when it enacted the Pembroke Pilot Program. Accordingly, we reject these arguments as well.

¶ 63 The Intervenors last argue that the Commission improperly failed to consider Nicor's capability of *operating* the new pipelines while providing service. Nicor disagrees and responds that subsection (d)(3) refers only to *construction*. See 220 ILCS 5/8-406.2(d)(3) (West Supp. 2021) ("the public utility is capable of efficiently managing and supervising *the construction* of the hardship area facilities and has taken sufficient action to ensure adequate and efficient *construction* and supervision of *the construction*" (emphases added)).

¶ 64 We agree with Nicor. Section 8-406.2 provides for the "extension of utility service area and facilities" into Pembroke Township. *Id.* § 8-406.2. Maintenance and operation are not implicated.

¶ 65                               b. Subsections (d)(4) and (d)(5)

¶ 66 As to subsections (d)(4) and (d)(5)—dealing with financial consequences to customers and project costs—the Intervenors contend the Commission failed to adequately consider customer costs. First, they argue the Commission failed to consider the cost for customers to convert or

27

upgrade appliances when evaluating whether Nicor could finance the project without significant adverse financial consequences to customers. Second, they argue the Commission relied on Nicor's flawed calculation of the threshold referred to in subsection (d)(5), which they contend "requires a reasonable assumption as to the number of new customers who will take service from the new pipeline," claiming Nicor did not consider whether new customers would be able to afford to convert their buildings to use natural gas. Without citation, they assert,

> "This calculation first requires calculating the current costs of 100-feet of low pressure or 200-feet of high pressure service line per new customer. Then, the dollar-equivalent of that allowance must be compared to the anticipated per-customer costs using the company's feasibility study regarding the projected number of new customers for this project, to determine whether the per-customer costs exceed 250% of otherwise allowed costs."

Both arguments assume the Commission was required to account for costs to customers in its analysis of these two factors.

¶ 67        Nicor responds that the Commission's findings were fully supported by the record. Specifically, consideration of costs to deploy the gas lines does not, as the Intervenors argue, require analysis of home heating conversion costs, and the record indicates "no customer deposits will be necessary" due to Nicor's financial position and the project's expected returns. Further, the statutory scheme reflects that customer costs to utilize natural gas were of minimal concern under subsection (d)(5).

¶ 68        We agree with Nicor and reject the argument that the Commission was required to consider costs for customers to convert to gas service under either subsections (d)(4) or (d)(5). Subsection (d)(4) concerns whether "the public utility is capable of financing the construction of the hardship area facilities without significant adverse financial consequences for the utility or its customers,"

28

and subsection (d)(5) concerns "the estimated cost to construct and deploy the hardship area facilities." *Id.* § 8-406.2(d)(4), (5). Both are "based upon the application filed with the Commission and the evidentiary record." *Id.* Nicor's application included a description of its proposed facilities—namely, approximately 34.7 miles of new gas distribution main and related facilities. See *id.* § 8-406.2(c)(3). Both potential adverse financial consequences and the estimated cost to construct and deploy the project are based on *Nicor's description of the proposed project*, not a projection as to how many new customers will take service, and the Intervenors do not identify any part of the evidentiary record the Commission overlooked. Indeed, the Commission based its decision on Nicor's proposal, stating:

> "The Commission is required to determine whether Nicor Gas is capable of financing the construction of these hardship facilities without significant adverse financial consequences for the utility or its customers. Staff reviewed the Company's proposal and determined that it will not require any specific financing to support the proposed additions to its system. The total cost of the Project is minimal in comparison to the Company's net utility plant and operating revenue. The Commission finds that Nicor Gas is capable of financing the Project without significant adverse financial consequences to the utility or its customers, and therefore, the Company has satisfied Section 8-406.2(d)(4).

> * * *

> The Commission finds that Nicor Gas has met the requirements under Section 8-406.2(d)(5) that the estimated cost to construct and deploy the hardship facilities is less than 250% of the amount allowed under the current tariffs to provide standard service to extend main and services. Under Nicor Gas' tariff, standard service allows up to 200 feet of main. Section 8-406.2(d)(5) would allow Nicor Gas to account for up to 500 feet of main

29

(250% of 200 feet) when computing the feasibility of the Project."

Consistent with the Commission's analysis, the statute requires no independent calculation of per-customer costs or an estimate of customers who will take service.

¶ 69　　　　The Commission based its findings that Nicor satisfied subsections (d)(4) and (d)(5) on the proposal itself and on Nicor's revenue. The Intervenors do not dispute the Commission's findings respecting the estimated cost of the project or Nicor's finances. Instead, they argue the Commission failed to consider costs to *deploy* the gas lines, which they understand to mean the costs for customer use ("The statutory language plainly requires analysis of the costs to construct *and deploy* (*i.e.* customer use) the pipeline" (emphasis in original)). Cost to deploy, they believe, includes costs to residents to make necessary conversions, upgrades, or appliance purchases.

¶ 70　　　　We disagree. The Utilities Act refers to "extension of utility service area and facilities" and cost to "deploy the hardship area facilities." *id.* § 8-406.2(d)(5); *id.* § 8-406.2(b) (" 'Designated hardship area' is limited to Pembroke Township"; " 'Hardship area facilities' means all gas distribution system facilities that are proposed to be constructed or extended and used to serve the designated hardship area, through and including retail gas meters."). The Utilities Act does not define "deploy," but Merriam-Webster Online Dictionary does. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/deploy (last visited Mar. 31, 2023) [https://perma.cc/L75C-UF4N] ("to extend (a military unit) especially in width"; "to place in battle formation or appropriate positions"; "to spread out, utilize, or arrange for a deliberate purpose"); see also Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/deploy (last visited Mar. 31, 2023) [https://perma.cc/6XV8-KYLR] ("to put something into use"); see also Facility, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/facility (last visited Mar. 31, 2023) [https://perma.cc/43B2-PP62] ("something (such as a hospital)

30

that is built, installed, or established to serve a particular purpose").

¶ 71      Considering all of these definitions, we infer the legislature intended that "deploy" refer to activity by the utility, not by a customer, because customers do not extend utility service areas or gas distribution system facilities; nor do they arrange, build, or install gas distribution system facilities, or otherwise put them into use. That "hardship area facilities" includes facilities "through and including retail gas meters" further suggests that equipment beyond retail gas meters (such as customer appliances) is not included. The estimated cost to deploy a pipeline, thus, refers to costs incurred by the utility alone. The Commission would have no need to consider the cost to customers when evaluating the cost to deploy.

¶ 72      Our conclusion that the Commission was not required to consider per-customer costs is confirmed elsewhere in section 8-406.2(d). Nicor was required to guarantee that residents could opt out of the program without being assessed any charges and to disclose to the Commission, before implementation, the cost for customers to utilize Nicor's services. 220 ILCS 5/8-406.2(d)(6), (8) (West Supp. 2021). To the extent the project results in significant costs to customers who take service, such costs must be disclosed "before implementation" and residents must have the choice to opt out. Adverse financial consequences owing to construction of the project would be borne by Nicor and customers who elect to receive service at a known cost, not to unsuspecting residents. Moreover, those who elect to receive service may be eligible to receive grant funding for appliance conversion. See 220 ILCS 85/10(a) (West Supp. 2021) ("The Program shall provide that the Department shall distribute grants, subject to appropriation, from moneys in the Pembroke Township Natural Gas Investment Fund for the conversion of appliances to be compatible with natural gas."); *id.* § 10(b) ("The Department [of Commerce and Economic Opportunity] shall adopt rules for the administration of the Program. \*\*\*. The rules shall allow for

conversion grants awarded to residents of Pembroke Township and to Pembroke Township to provide assistance for the use of natural gas and shall ensure that the applicant complies with all other requirements of the rules."). Simply put, customer costs are addressed elsewhere in the statutory scheme.

¶ 73     Last, the Intervenors suggest that section 8-406(d) of the Utilities Act required the Commission to "attach primary weight to the cost or cost savings to the customers of the utility." 220 ILCS 5/8-406(d) (West 2020). We flatly reject that argument because section 8-406(d) does not apply. See *Elgin*, 2016 IL App (2d) 150047, ¶ 56; *supra* ¶¶ 19-33.

¶ 74     Accordingly, we cannot say the Commission abused its discretion when it found Nicor satisfied section 8-406.2(d)(4) and (5).

¶ 75                                D. Denial of Rehearing

¶ 76     Finally, the Intervenors contend the Commission erred when it denied their application for rehearing. They sought rehearing before the Commission so it could consider new evidence, arguing as follows:

> "New information about Nicor's system safety, and new case law which demonstrates its relevance (*Save Our Illinois Land*) is directly relevant to Section 8-406.2(d)(3). Evidence of Nicor's previously-undisclosed collaboration with public officials that may have influenced public input rebuts Nicor's claims of public support and undermines the legitimacy of its public meetings pursuant to Section 8-406.2(c)(6). Recent supply and distribution cost increases further exacerbate the financial challenges potential customers may face in converting to and using natural gas, relevant to Section 8-406.2(d)(4) and (5). Similarly, new arrearage data for low-income Nicor customers is relevant to the financial impact of the proposed project."

¶ 77 Review of the Commission's denial of an application for rehearing on the basis of new evidence is governed by section 10-201(e)(ii) of the Utilities Act. 220 ILCS 5/10-201(e)(ii) (West 2020). Specifically,

> "If it appears that the Commission failed to receive evidence *properly proffered*, on a hearing or a rehearing, or an application therefor, the court shall remand the case, in whole or in part, to the Commission with instructions to receive the testimony so proffered and rejected, and to enter a new order based upon the evidence theretofore taken, and such new evidence as it is directed to receive, unless it shall appear that such new evidence would not be controlling, in which case the court shall so find in its order." (Emphasis added.) *Id.*

Thus, this court has a duty to remand a case only if a party can show it properly proffered new evidence and the new evidence would be controlling.

¶ 78 Nicor responds that the Intervenors failed to properly proffer new evidence in that they submitted no new testimony. Our review of the record indicates the Intervenors attached no testimony, affidavits, or other documents to their application for rehearing to support their vague evidentiary allegations. Nevertheless, the Intervenors maintain that their submission of conclusory statements concerning proposed additional evidence was sufficient to warrant rehearing.

¶ 79 We agree with Nicor. The Intervenors made no proffer of evidence to support their contentions, thus it does not appear the Commission failed to receive evidence properly proffered. See *In re Marriage of Prusak*, 2020 IL App (3d) 190688, ¶ 33 (noting that unproven allegations are not evidence). Consequently, there is no duty to remand the case to receive new evidence.

¶ 80                                        III. CONCLUSION

¶ 81 For the reasons stated, the order of the Illinois Commerce Commission is affirmed.

¶ 82 Affirmed.

*Pembroke Environmental Justice Coalition v. Illinois Commerce Comm'n*,
**2023 IL App (3d) 220108**

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Commerce Commission, No. 21-0698. |
| **Attorneys for Appellant:** | Emma Clouse and Aneel L. Chablani, of Chicago Lawyers' Committee for Civil Rights, and Naomi Davis, both of Chicago, and Christie Hicks, Environmental Defense Fund, of Palos Heights, for petitioners. |
| **Attorneys for Appellee:** | Brian J. Dodds, Robert W. Funk, and Thomas R. Stanton, Special Assistant Attorneys General, for respondent Illinois Commerce Commission. |
| | Clifford W. Berlow and John E. Rooney, of Jenner & Block LLP, of Chicago, for respondent Northern Illinois Gas Company. |
| | No brief filed for other respondents. |